## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND**, on behalf of itself and all others similarly situated,<br>**Plaintiffs,**<br><br>v.<br><br>**ACTAVIS HOLDCO US, INC., TARO PHARMACEUTICALS U.S.A., INC., TEVA PHARMACEUTICALS USA, INC.,**<br>**Defendants.** | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**No:** |

Plaintiff, Philadelphia Federation of Teachers Health and Welfare Fund, ("PFTHW" or "Plaintiff") brings this action both individually and on behalf of a class of persons or entities which purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Fluocinonide manufactured by Defendants, Actavis Holdco US, Inc. ("Actavis"), Taro Pharmaceuticals U.S.A., Inc. ("Taro") and Teva Pharmaceuticals USA, Inc. ("Teva") (each a "Defendant" or collectively "Defendants").

## I.    INTRODUCTORY STATEMENT

1.    Defendants are accused of engaging in a conspiracy to fix, maintain, and/or stabilize the prices of generic Fluocinonide drug products.  All allegations herein are based on information and belief, except for those relating to the Plaintiff.

2.    Fluocinonide is a high potency topical glucocorticoid available by prescription and used to treat inflammation and pruritic skin conditions caused by psoriasis, atopic dermatitis, and allergic reactions.  It has been available in generic forms since the late 1980's.  Like other topical steroids, Fluocinonide has anti-inflammatory, antipruritic, and vasoconstrictive properties.

Topical steroids are grouped by classification from US Class I (the most potent) to US Class VII (the least potent).  Over-the-counter hydrocortisone is a Class VII topical steroid.  Fluocinonide is a Class II topical steroid, up to 150 times more potent than hydrocortisone.  Fluocinonide is available as a cream, cream with emulsified base, gel, ointment, and solution, to be used by adult patients.

3.     According to the U.S. Food and Drug Administration, nearly eight out of ten prescriptions filled in the United States are generics.  Generic drugs are required to have the same active ingredient, strength, dosage form, and route of administration as the brand name product.  Historically, generic drugs have sold at seventy-five percent less than the branded version.[1]  As of June 2015, it was estimated that consumers save $8 to 12 billion per year at the pharmacy.[2]

4.     Skyrocketing price increases for generic drugs, frequently in lockstep by multiple manufacturers, recently has caused multiple federal and state agencies to launch investigations into the generic drug industry's pricing practices, including the House Committee on Oversight and Government Reform, the Subcommittee on Primary Health and Aging, Senate Committee on Health, Education, Labor and Pensions, the Justice Department, and multiple states' attorneys general.

5.     These price increases do not stem from competitive behavior caused by, for instance, supply shortages or changed product demand.  Rather, Defendants' engaged in a broad and wide-ranging conspiracy to fix, raise, maintain and stabilize generic drugs' prices, and to allocate customers and markets for them.  Defendants effectuated their conspiracy by direct business-to-business contacts among generic drug manufacturers, secret communications and

---

[1] http://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/UnderstandingGenericDrugs/ucm167991.htm.

[2] http://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/UnderstandingGenericDrugs/ucm144456.htm.

meetings, and/or joint participation taken under the guise of trade associations like the Generic Pharmaceutical Association ("GPhA"). For example, representatives from Actavis, Sandoz, Taro, and Teva attended a GPhA CMC Workshop in North Bethesda, Maryland between June 3 and June 4, 2014.

6.    During October 2014, Rep. Elijah Cummings, Ranking Member of the House Committee on Oversight and Government Reform, and Sen. Bernie Sanders, Chairman of the Subcommittee on Primary Health and Aging of the Senate Committee on Health, Education, Labor and Pensions, launched investigations into soaring pricing for generic drugs. Senator Sanders noted "[m]ore than one out of four Americans do not fill their prescriptions because they cannot afford the cost." As a result of joint document requests sent to generic drug manufacturers, the investigative committee received over 300,000 pages of documents. According to Representative Cummings, these documents "provide an insider's view into how drug company executives are lining their own pockets at the expense of some of the most vulnerable families in our nation."

7.    The Department of Justice ("DOJ") and the Connecticut Attorney General's Office ("CTAG") have both issued subpoenas to as many as a dozen generic drug companies concerning prices of at least two dozen drugs. The DOJ's subpoenas arose from a grand jury proceeding in the Eastern District of Pennsylvania that is investigating whether Defendants and other drug manufacturers conspired to fix generic drug prices.

8.    On September 9, 2016, Defendant, Taro Pharmaceutical Industries Ltd., parent company of Taro U.S.A., and two of its senior officers were served grand jury subpoenas in connection with DOJ's antitrust investigation. The subpoenas demand documents related to Taro's generic pharmaceutical products, pricing and communications with competitors. The DOJ's subpoenas follow a number of press reports that highlighted concerns about the rising prices of

generic Fluocinonide.

9.      Additionally, on December 14, 2016, the attorneys general ("AG") of twenty states filed a complaint against multiple generic manufacturers of doxycycline hyclate for conspiring to fix the prices and allocate the market for this medication.[3]  On March 1, 2017, an amended complaint was filed, in which the attorneys general of an additional twenty states joined, and added additional claims of violations of states' antitrust laws, in addition to the alleged violations of federal antitrust laws.

10.     Significantly, the AG Complaint indicates that these actions by the generic manufacturers of doxycycline hyclate were not isolated and limited to that drug.  Rather, the AG Complaint mentions a "wide-ranging series of conspiracies implicating numerous different drugs and competitors."[4]

11.     The conduct includes schemes to fix and maintain prices, allocate markets and otherwise thwart competition which has caused "significant, lasting and ultimately harmful rippling effect in the United States healthcare system, which is still ongoing today."[5]

12.     The AG Complaint acknowledged that "[m]ost of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct.  The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate.  When communications were made in writing, or by text message, some of the Defendants even took overt and calculated steps to destroy evidence of those communications."[6]

---

[3] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 VLB (D. Conn.).
[4] *Id.* at ¶9.
[5] *Id.* at ¶8.
[6] *Id.* at ¶13.

13.     Fluocinonide is one of the generic drugs which has experienced recent, unusually high, price increases.  During August 2016, the United States Government Accountability Office (GAO) issued a report to Congress which evaluated generic drugs' price history from 2010 through the second quarter of 2015.[7]  This Report found that generic Fluocinonide cream 0.05%, generic Fluocinonide cream with emulsified base 0.05%, generic Fluocinonide gel 0.05%, and generic Fluocinonide ointment 0.05% experienced multiple "extraordinary price increase[s]" from 2011 to 2012 and again during the period from 2014 to 2015.[8]

14.     During August to September 2014, Defendants simultaneously raised prices for generic Fluocinonide.  The prices for all generic Fluocinonide at issue here at least doubled.  Some increased by over 600%

15.     Plaintiff believes that generic Fluocinonide's extraordinary price increases result from a conspiracy among these Defendants to fix, raise, maintain and stabilize generic drugs' prices, and to allocate customers and markets for generic Fluocinonide.  These increases were neither the product of a competitive market, nor made necessary by any increased manufacturing costs.  Defendants' price increases resulted from their conspiracy to restrain trade.

16.     Defendants' conspiracy has further benefited from oligopolistic market conditions, caused by the low number of competitors and barriers to entry in the generic Fluocinonide market.  Such conditions have allowed Defendants to sustain anticompetitive behaviors such as their increased pricing as of the filing of this Complaint.

17.     Defendants' conspiracy to fix, raise, maintain and stabilize the prices of generic Fluocinonide has caused and continues to cause consumers and third-party payors to pay

---

[7] Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases GAO-16-706: Published: Aug 12, 2016. Publicly Released: Sep 12, 2016.
[8] *Id. at* 37.

supracompetitive prices for generic Fluocinonide.

18.     Plaintiff brings this civil antitrust action on behalf of a proposed class of endpayors who indirectly purchased, reimbursed, or otherwise paid for (1) generic Fluocinonide cream 0.05%, (2) generic Fluocinonide cream with emulsified base 0.05%, (3) generic Fluocinonide gel 0.05% and/or (4) generic Fluocinonide ointment 0.05% (collectively "Fluocinonide").

19.     Plaintiff seeks to certify a class, the "Injunctive Class", composed of all individuals and entities in the United States or its territories who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for Fluocinonide, other than for resale, for consumption by itself, its families, or its members, employees, insureds, participants, or beneficiaries, from at least as early as August 1, 2014 through and including the date that the anticompetitive effects of Defendants' unlawful conduct ceased (the "Class Period").

20.     Plaintiff also seeks to certify a class, the "Damages Class", composed of all individuals and entities who, in Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for fluocinonide, other than for resale, for consumption by itself, its families, or its members, employees, insureds, participants, or beneficiaries, from at least as early as August 1, 2014 through and including the date that the anticompetitive effects of Defendants' unlawful conduct ceased.

21.     Plaintiff seeks overcharge damages and other relief arising out of Defendants' agreement not to compete in the market for generic Fluocinonide.

22.     Defendants' coordinated conduct as alleged herein was designed to and did raise,

fix, maintain, or stabilize the price of generic Fluocinonide. As a result, Defendants violated sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and the various state antitrust and consumer protection laws enumerated below. Plaintiff seeks damages and injunctive relief to prevent Defendants from continuing and maintaining the anticompetitive combination, conspiracy, or agreement alleged in this complaint.

## II.   JURISDICTION AND VENUE

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 1, 3 and 26. This Court has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which there are over 100 members of the Class (as defined herein); the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs; and at least one member of the Class is a citizen of a state different from that of one of the Defendants.

24.    Jurisdiction and venue are proper in this Court under 28 U.S.C. § 1391 because Defendants transact business in this District and Defendants Fougera and Taro maintain their principal places of business in this District. A substantial part of the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried on in part within this District. The acts complained of have and will continue to have substantial effects in this District.

## III.  PARTIES

### A.    Plaintiff

25.    Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHWF") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal

Revenue Code for the purpose of providing health benefits to eligible participants and beneficiaries. PFTHW maintains its principal place of business in Philadelphia, Pennsylvania. PFTHW provides health benefits, including prescription drug benefits, to approximately 34,000 participants, and their spouses and dependents. During the Class Period, PFTHWF purchased and paid for some or all the purchase price for generic Fluocinonide, thereby suffering injury to its business and property by reimbursing more for this product than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers.

### B.    Defendants

26.    Defendant, Actavis Holdco US, Inc. ("Actavis"), is a Delaware corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey, 07054. In August 2016, Teva Pharmaceuticals U.S., Inc. acquired Actavis' generics business from Allergan plc for $33.43 billion in cash and approximately 100 million Teva shares. Actavis manufactures, markets, and sells generic drug products. Actavis partnered with G&W Laboratories, Inc., whereby G&W Laboratories manufactured fluocinonide that Actavis distributed under its own trade dress. During the Class Period, Actavis sold generic fluocinonide in the United States.

27.    Defendant, Fougera Pharmaceuticals, Inc., is a New York corporation with its principal place of business at 60 Baylis Rd, Melville, New York, 11747. During 2012, Defendant Sandoz purchased Fougera Pharmaceuticals for $1.5 billion. Fougera markets and sells generic Fluocinonide throughout the United States.

28.    Defendant, Sandoz, Inc. ("Sandoz") is a Colorado corporation with a principal place of business at 100 College Rd. West, Princeton, New Jersey, 08540. Sandoz, Inc., is the

United States affiliate of Sandoz International GmbH, a company organized and existing under the laws of Germany, having its principal place of business in Holzkirchen, Germany. Sandoz, Inc. is responsible for the distribution of drugs developed and manufactured by Sandoz International. Together, Sandoz International and Sandoz, Inc. operate as the generic pharmaceuticals division of Novartis International AG, a global healthcare company based in Switzerland. Sandoz markets and sells generic Fluocinonide throughout the United States.

29.    Defendant, Taro Pharmaceuticals U.S.A., Inc., is a New York corporation with its principal place of business at 3 Skyline Drive, Suite 120, Hawthorne, New York, 10532. Taro U.S.A. markets and sells generic Fluocinonide throughout the United States. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries Ltd., an Israeli company with its principal place of business in Haifa, Israel.

30.    Defendant, Teva Pharmaceuticals USA, Inc. ("Teva"), is a Pennsylvania corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454. Teva is a subsidiary of Teva Pharmaceutical Industries Limited, an Israeli company with principal place of business located at 5 Basel Street, Petach Tikva, Israel 49131. Teva manufactures, markets, and sells various generic pharmaceutical products. During the Class Period, Teva manufactured and sold generic fluocinonide in the United States.

31.    All acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

## IV.    CO-CONSPIRATORS AND AGENTS

32.    At all relevant times, each Defendant acted in concert, pursuant to a common, unlawful plan and conspired together to fix, raise, maintain, and stabilize the prices and allocate

markets and customers, injuring Plaintiff, Class Members and other similarly situated individuals. Each aided and abetted the other. For these reasons, they are jointly and severally liable.

33.     The acts alleged against Defendants in this Complaint were authorized, ordered, and/or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of defendants' businesses and affairs.

34.     Other, presently unidentified firms, corporations, entities and/or individuals, not made defendants in the complaint, participated as co-conspirators with Defendants in the violations alleged in this complaint, and performed acts and made statements in furtherance thereof conspiracy alleged. Said firms, corporations, entities and/or individuals can be readily identified from documents in Defendants' possession, and will be named in an amended complaint, with leave of the Court, as soon as the relevant information is made available.

## V.     **INTERSTATE AND INTRASTATE COMMERCE**

35.     Defendants' conduct has taken place within the flow of, and substantially affected the interstate commerce of, the United States. By way of example, Defendants and used the instrumentalities of interstate commerce, including interstate wires and the U.S. mail, to market, distribute and/or sell substantial quantities of generic Fluocinonide throughout the United States. Defendants also used interstate wires and the U.S. mail to distribute and/or receive sales and/or marketing information, receipts, invoices, statements and payments related to generic Fluocinonide in the United States.

36.     During the Class Period, Defendants sold substantial quantities of generic Fluocinonide in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

37.     Defendants' anticompetitive conduct has substantial intrastate effects in that, inter

alia, generic Fluocinonide has been and is offered at higher prices to end-payors inside each respective state than they would have been or would be but for Defendants' conduct. The complete lack of availability of competitive priced generic Fluocinonide directly impacts and disrupts commerce for end-payors within each state.

## VI.    FACTUAL ALLEGATIONS

### A.    Background Regarding Generic Prescription Drugs

38.    "A generic drug is chemically equivalent to its branded counterpart and is generally marketed by multiple manufacturers under a nonproprietary name; generic drugs can be introduced with the Food and Drug Administration's (FDA) approval after the patent for the branded counterpart has expired."[9]  Generics in mature markets often cost as little as 10-15% of the branded drug's price.[10]  Defendants manufacture and sell, *inter alia*, generic versions of branded drugs once any applicable patent on the branded drugs expires.

39.    Once a generic version of a drugs enters the market, the branded drug's market share quickly erodes.  Per IMS Health data, generic drugs accounted for 86% of all drugs dispensed in the United States in 2013.[11]

40.    As additional versions of a particular generic drug enter the market, the price that consumers and third-party payors pay for the drugs drops.  In a competitive market, both the branded manufacturer and the older generic manufacturers lower prices in response to the new competitor, as the following FDA chart shows[12]:

---

[9]    *See Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases*, at 1, GAO-16-706:

[10]    FTC Staff Study, *Pay-For-Delay: How Drug Company Pay-Offs Cost Consumers Billions*, at 8 (Jan. 2010), available at http://emmanuelcombe.org/delay.pdf.

[11]    IMS Institute for Healthcare Informatics, Medicine use and shifting costs of healthcare: *A Review of The Use of Medicines in The United States In 2013* (Apr. 2014), at 51, available at http://www.imshealth.com/en/thought-leadership/quintilesims-institute/reports/use-of-medicines-in-the-us-2013.

[12]    FDA, *Generic Competition and Drug Prices*,

**Generic Competition and Drug Prices**



Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

41.    Thus, generic drugs lower costs for consumers, in the form of lower copayments
and other out-of-pocket costs, and for third-party payers, including private health insurance plans
such as Plaintiff.

42.    Accordingly, generic competition to a branded drug can provide billions of dollars
in savings to consumers, pharmacies, other purchasers, private health insurers, health and welfare
funds and state Medicaid programs, which reimburse drug purchases for their insureds.  A GPhA
study found that generic drugs saved the U.S. healthcare system $1.68 trillion between 2005 and
2014, including $254 billion in 2014 alone.[13]

43.    In 1984, Congress enacted the Drug Price and Patent Term Restoration Act of 1984,
(the "Hatch-Waxman Act"), partly to assist manufacturers to bring generic drugs to market more
quickly.  The Hatch-Waxman Act provides an expedited pathway for generic drug companies to
obtain Food and Drug Administration (FDA) approval.  The Act created a new type of application
for a generic drug manufacturer to file, an Abbreviated New Drug Application ("ANDA") in order

http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm.
[13]  Generic Pharmaceutical Association, *Generic Drug Savings in the U.S.*, at 1 (2015),
http://www.GPhAonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

to obtain FDA approval. The ANDA permits a generic drug manufacturer to rely on the branded drug's manufacturer's safety and reliability data. An ANDA applicant must show that its generic drug is bioequivalent to the brand drug. This reliance allows the generic company to forego duplicative and expensive experimentation and having to perform its own clinical trials. The FDA will assign a "Therapeutic Equivalence Code" ranging from "AA" to "BX." An "AB" rating signifies that the approved generic drug is therapeutically equivalent to its branded counterpart.

44.    Since passage of the Hatch-Waxman Act, pharmacist are permitted, or required by state law, to substitute a less expensive generically equivalent drug for the brand name version unless requested otherwise by the purchaser or indicated otherwise by the prescriber.

45.    Defendants Taro and Taro have been marketing generic Fluocinonide products since 1984. In 1994, Defendant Fougera first received approval to market its generic Fluocinonide. G&W Laboratories has been manufacturing generic Fluocinonide since 1988 and Actavis received its ANDA approval in early 2014.

### B.    Consolidation of the Generic Drugs Market

46.    In theory, a generic drug may be manufactured and marketed by any pharmaceutical manufacturer after receiving an approved ANDA. However, generic drug manufacturers have recently experienced a global wave of consolidations, acquisitions and mergers which have reshaped the market. Pharmaceutical manufacturers, in order to gain market share and maintain profitability, have resulted to buying out their competitors. The result, as is the case here, many generic drugs are produced by only a few manufacturers. There are fewer companies applying for new ANDAs for older generics. For instance, Fougera, which specialized in generic topical treatments, antibiotics, and antifungals, was purchased by Sandoz, another generic drug company. Teva Pharmaceutical Industries Ltd., acquired Ivax Corporation for $7.4 billion in 2006; Barr

Laboratories for $7.4 billion in 2008; Ratiopharm, Germany's second largest generic drug producer, for $5 billion in 2010; and Actavis Generics for $33.4 billion in 2016.

47.     The generic Fluocinonide market is now highly concentrated.   Since 1982, approximately ten different companies received ANDA approvals for generic Fluocinonide products.  Presently, the primary marketers for generic Fluocinonide products are Defendants herein.

48.     The consequence of the generic drug industry's consolidation and coordinated pricing activity has been higher prices for consumers.  Market consolidation also has resulted in more generic product lines being combined or discontinued, further reducing price competition.

C.     **Fluocinonide Price Increases**

49.     In 2012, the Centers for Medicare and Medicaid Services commissioned a national consulting firm with expertise in Medicare and Medicaid, Myers and Stauffer, to take surveys of pharmacies across the U.S. to determine the average price of prescription drugs.   Myers and Stauffer conducts a monthly nationwide survey of retail community pharmacy prescription drug prices and calculates a statistically weighted average price for each drug.   The survey evaluates geographic, chain and independent, rural and urban cost variations to arrive at a price for each generic drug surveyed.   The National Average Drug Acquisition Cost "NADAC") is a master list which is updated and published weekly since October 2102.  The NADAC thus reflects the actual costs per unit, in this case grams, that drug manufacturers charge for their medications at retail pharmacies across the United States.  Medicaid administrators use the NADAC price information to evaluate their reimbursement policies.   The table below compares NADAC prices for each dosage during October 2012, December 2013 and October 2014.   It depicts the uniform price changes, by each of the Defendants, for each dosage level.

50.    During August 2014, the NADAC price of generic Fluocinonide dramatically increased, for all dosages, by each of the Defendants. These increases were the product of a horizontal agreement among Defendants to increase pricing and restrain competition.

NADAC Price Per Gram

| Dosage | Oct. 2012[14] | Dec. 2013[15] | Oct. 2014[16] | Increase[17] |
|---|---|---|---|---|
| Cream, 15 gm | $0.65261 | $0.76703 | $1.97 | 202% |
| Cream, 60 gm | $0.31755 | $0.36457 | $1.54 | 385% |
| Gel, 15 gm | $0.86876 | $0.9959 | $1.93 | 122% |
| Gel, 60 gm | $0.76669 | $0.6511 | $1.83 | 139% |
| Ointment, 15 gm | $1.0548 | $1.16536 | $2.57 | 144% |
| Ointment, 60 gm | $0.50816 | $0.59724 | $2.33 | 358% |
| Emul. crm. 15 gm | $0.2178 | $0.89276 | $1.60 | 635% |

51.    The foregoing demonstrates the simultaneous actions by all Defendants, which increased the price of generic Fluocinonide increased by a magnitude of over one hundred to several hundred percent.

52.    Since then, Defendants have acted in concert to maintain their artificially inflated prices for generic Fluocinonide. As of September 2016, the price of generic Fluocinonide remains more than 97% to 738% higher than the price prior to the June 2014 trade association meeting.

NADAC Price Per Gram

| Dosage | Oct. 2012 | Sept. 2016[18] | Increase[19] |
|---|---|---|---|
| Cream, 15 gm | $0.65261 | $1.28918 | 97% |
| Cream, 60 gm | $0.31755 | $1.05445 | 232% |
| Gel, 15 gm | $0.86876 | $2.70037 | 211% |
| Gel, 60 gm | $0.76669 | $1.9044 | 148% |
| Ointment, 15 gm | $1.0548 | $2.14585 | 103% |
| Ointment, 60 gm | $0.50816 | $1.20024 | 136% |

---

[14] CMS, Weekly NADAC Reference File as of 10/04/2012, available at https://www.medicaid.gov/medicaid/prescription-drugs/survey-of-retail-prices/index.html.
[15] CMS, Weekly NADAC Reference File as of 12/25/2013, available at https://www.medicaid.gov/medicaid/prescription-drugs/survey-of-retail-prices/index.html.
[16] CMS, Weekly NADAC Reference File as of 10/08/2014, available at http://truecostofhealthcare.net/pharmacy_price_index/.
[17] Percentage of price increases of October 2012 prices versus October 2014 prices.
[18] CMS, NADAC weekly reference data from November 2013 to current week, https://data.medicaid.gov/Drug-Prices/NADAC-as-of-2016-09-28/it6z-ygev.
[19] Percentage of price increases of October 2012 prices versus September 2016 prices.

| Emul. crm. 15 gm | $0.2178 | $1.82533 | 738% |
| --- | --- | --- | --- |

53.     Without changes in the market or supply shortages, competition in the market for generic Fluocinonide should have maintained prices at the late 2012 levels.   AARP Policy Institute's Rx Price Watch Report notes that retail prices for 115 specialty prescription drugs increased by 10.6 percent on average in 2013, compared with a 1.5 percent inflation rate over the same period.  The sudden, unexplained and sustained price increase can be reasonably inferred to be caused by anticompetitive behavior by the generic manufacturers, i.e., illegal collusion among the generic manufacturers to fix, raise, maintain or stabilize the price of generic Fluocinonide.

54.     The mirror-image price increases has negatively affected both consumers and third-party payers, such as Plaintiff.

**D.     Government Investigations**.

55.     During approximately this same period of time that generic Fluocinonide prices increased, prices for a number of other generic drugs also increased dramatically.  These increases led to investigations by the House Committee on Oversight and Government Reform, the Subcommittee on Primary Health and Aging, Senate Committee on Health, Education, Labor and Pensions, the Justice Department's ("DOJ") Antitrust Division, the Department of Health and Human Services' Inspector General and the attorneys general of Connecticut, Delaware, Florida, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, New York, Nevada, North Dakota, Pennsylvania, Ohio, Virginia and Washington State.

56.     The Congressional investigation revealed that the prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014.[20]

---

[20]  "Generic Drug Price Sticker Shock Prompts Probe by Congress," ABC News, Nov 21, 2014, By Gillian Mohney.  http://abcnews.go.com/Health/generic-drug-prices-skyrocketing-lawmakers-warn/story?id=27060992.

57.     After a Senate hearing on February 24, 2015, Rep. Cummings and Sen. Sanders wrote to the U.S. Department of Health & Human Services' Office of the Inspector General ("OIG") asking OIG to investigate how Defendants' price increases affected spending in the Medicare and Medicaid programming.[21]  OIG accordingly began to review quarterly average manufacturer prices for the top 200 generic drugs from 2005 to 2014.[22]

58.     The DOJ also launched a probe into alleged price-fixing among generic manufacturers.  In November 2014, the DOJ issued grand jury subpoenas to many generic manufacturers requesting documents, information, and testimony relating to "communication or correspondence with any competitor in the sale of generic prescription medications." Impax Laboratories, Inc. was the first to disclose having received a subpoena.[23]  In September 2016, Taro Pharmaceuticals, disclosed that it, "as well as two senior officers in its commercial team, received grand jury subpoenas from the [DOJ]," seeking, among other things, "communications with competitors and others regarding the sale of generic pharmaceutical products."[24]

59.     On December 12, 2016, the DOJ filed criminal charges against Jeffrey Glazer and Jason Malek, the respective former Chief Executive Officer and President of Heritage Pharmaceutical, Inc., charging them of conspiring to "knowingly enter[] into and engag[ing] in a combination and conspiracy other persons and entities engaged in the production and sale of generic pharmaceutical products, the primary purpose of which was to allocate customers, rig bids,

---

[21] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.
[22] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.
[23] Impax Laboratories, Inc. Current Report (Form 8-K) (November 3, 2014).
[24] Taro, SEC Form 6-K (Sept. 9, 2016), http://phx.corporate-ir.net/phoenix.zhtml?c=114698&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTExMTM0MjUwJkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3.

and fix and maintain prices of doxycycline hyclate sold in the United States."[25]  On January 10,

2017, each pled guilty to two-count felony charges.

60.     A press release issued by DOJ in conjunction with these filings stated:

"Millions of Americans rely on prescription medications to treat acute and chronic health conditions.  By entering into unlawful agreements to fix prices and allocate customers, these two executives sought to enrich themselves at the expense of sick and vulnerable individuals who rely upon access to generic pharmaceuticals as a more affordable alternative to brand-name medicines," said Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division. "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."

"Conspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law," said Special Agent in Charge Michael Harpster of the FBI's Philadelphia Division.  "It's a sad state of affairs when these pharmaceutical executives are determined to further pad their profits on the backs of people whose health depends on the company's drugs. The FBI stands ready to investigate and hold accountable those who willfully violate federal antitrust law."

Today's charges are the result of an ongoing federal antitrust investigation into price fixing, bid rigging and other anticompetitive conduct in the generic pharmaceutical industry, which is being conducted by the Antitrust Division's Washington Criminal I Section with the assistance of the FBI's Philadelphia Division, the FBI headquarters' International Corruption Unit, the United States Postal Service Office of Inspector General and the U.S. Attorney's Office for the Eastern District of Pennsylvania.[26]

61.     On December 14, 2016, the attorneys general ("AG") of twenty states filed a

complaint against multiple generic manufacturers of doxycycline hyclate for conspiring to fix the

prices and allocate the market for this medication.[27]

---

[25] "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).
[26] https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.
[27] *State of Connecticut v. Aurobindo Pharma USA, Inc., et al.*, No. 3:16-cv-2056 VLB (D. Conn.).

62.     The AG Complaint alleges a "wide-ranging series of conspiracies implicating numerous different drugs and competitors."[28]  The Complaint identifies that the conspiracy among multiple generic drug manufacturers is facilitated by direct communications among competitors concerning pricing and market allocation.[29]  Defendants attempted to conceal evidence of their communications by deleting texts and other writings.  Defendants also had an opportunity to coordinate their price-fixing schemes while attending various trade association meetings or customer-sponsored conferences.[30]  Further opportunities occurred during industry dinners or "Girls Night Out," attended by officers and executives of various generic drug manufacturers, during which the attendees discussed competitively sensitive information.[31]  Consequently, the supposed competitors "are often acutely aware of their competition and, more importantly, each other's current and future business plans."[32]

63.     The AG Complaint makes it clear that the price increases are not the result of market forces, but are the result of the conspiracy alleged herein, stating:

> "Generic drug manufacturers argued publicly that the significant price increases [for generic drugs] were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines. What the Plaintiff States have found through their investigation, however, is that the reason underlying many of these price increases is much more straightforward, and sinister – collusion among generic drug competitors." [33]

**E.     Collusion in the Generic Drug Market.**

64.     The United States' generic Fluocinonide market displays various qualities that place it at risk of collusion and other anticompetitive behavior.  Such qualities include: (1) high

---

[28] *Id. at* ¶9.
[29] *Id. at* ¶¶11 – 12.
[30] *Id. at* ¶¶49 – 52.
[31] *Id. at* ¶¶54 – 57.
[32] *Id. at* ¶61.
[33] *Id. at* ¶6.

concentration; (2) high barriers to entry; (3) inelasticity of demand; (4) lack of available product substitutes; and (5) opportunities to conspire.

65.    As above, Defendants used various means of direct communications, trade association meetings, including those sponsored by GPhA, customer conferences, industry dinners and girls nights out as opportunities to meet in furtherance of this conspiracy.

66.    The purpose of these secret, conspiratorial meetings, discussions, and communications was to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful price-fixing and market and customer allocation scheme.

67.    Further, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to third parties, including Plaintiff and Class Members.  Due to Defendants' conduct, Plaintiff and Class Members could not have known that they were paying an artificially inflated price for generic Fluocinonide.  Therefore, Defendants are estopped from asserting any applicable statute of limitations in defense of this action.

68.    As a result of Defendants' unlawful agreements, Plaintiff and members of the Classes were injured because they paid, and continue to pay, supracompetitive prices for generic Fluocinonide sold in the United States during the period August 1, 2014 through the present.

1.    **Concentration in the Market**.

69.    Concentration in a market for goods creates susceptibility for collusion and other anticompetitive conduct.  The market for generic Fluocinonide cream and ointment is highly concentrated.  Defendants each possess large market shares in their respective markets.  In fact, Defendants Fougera, Teva and Taro control nearly all of the market for generic Fluocinonide cream 0.05%, emulsified cream 0.5%, gel 0.5% and topical ointment 0.05%.  Only a handful of competitors exist in each market.  Perrigo entered the market in early 2014 with a generic

Fluocinonide cream 1%.   The limited number of manufacturers in this market facilitated Defendants' ability to coordinate prices of their generic drugs.

70.     The market for Fluocinonide is mature and Defendants can only compete on price in order to gain market share.   Per IMS Health sales data, annual sales of just generic Fluocinonide cream were approximately $103 million for the twelve months ended March 2014.

### 2.      High Barriers to Entry.

71.     Typically, markets for goods that have high prices attract new competitors who can undercut competition by offering lower prices to the consuming public, thus mitigating effects of collusion.   However, when a market has high barriers to entry, new competitors are less likely to enter the market.   Accordingly, high barriers to entry facilitate collusive behavior.

72.     The market for generic Fluocinonide has high barriers to entry, including regulatory, intellectual property and financial hurdles.

73.     All generic drug manufacturers must receive FDA approval prior to marketing and selling products.   FDA approval requires, inter alia, the preparation and filing of an ANDA, which typically costs at least $1 million.[34]   Bringing a new generic drug to market may cost another $5 to $20 million.[35]

74.     Further, both state and federal law govern the operation of drug manufacturing facilities.   Such costs of doing business are another regulatory barrier to entry for potential competitors.

75.     Intellectual property costs can include acquisition of, and litigation over, patent rights, either through the investigation of whether a drug compound is protected by a valid patent

---

[34] Testimony of Dr. Scott Gottlieb, Hearing on "*Why Are Some Generic Drugs Skyrocketing in Price?*" (Nov. 20, 2014), available at https://www.aei.org/wp-content/uploads/2014/11/Gottlieb-Generic-Drug-Testimony-112014.pdf, at 7.
[35] *Id.*

or for establishment of preferred generic treatment under the Hatch-Waxman Act. Transactional costs such as licensing deals can add further layers of costs.

76.    Finally, generic drug makers also incur large research and development costs, high labor costs to retain employees with specialized skills and knowledge as well as professional certifications suitable for the work required, significant capital outlay for sufficient real estate and equipment, and other corporate financial requirements inherent to the pharmaceutical industry.

77.    The small number of competitors in the generic Fluocinonide market reflects these high barriers to entry.

### 3.    Inelastic Demand.

78.    In economics, elasticity of demand is the sensitivity of supply and demand to changes in one or the other. Price elasticity is defined as the measure of how much the quantity demanded will change if price, a separate factor, changes. When price elasticity of demand is inelastic, prices increase because there will only be a small decrease in demand relative to the price increase, such that the increases make up for the decreases. Accordingly, total revenues rise in a market with price inelasticity of demand, even if raw sales figures go down.

79.    Perfectly inelastic demand occurs when consumers would pay anything for a good, such as food or water, which is necessary for survival. Colluding entities can profit handsomely from goods that have nearly perfectly inelastic demand because they can charge whatever they wish knowing, first, that consumers will pay whatever price is charged, and second, that the collusion blocks any kind of competition that should serve to lower prices in that market.

80.    Accordingly, Defendants have been able to reap materially significant profits as a result of attacking the integrity of the market for generic Fluocinonide, as the market for the drug displays a price inelasticity of demand.

### 4.     Lack of Available Product Substitutes.

81.     As above, generic Fluocinonide is a high potency topical glucocorticoid available by prescription. Adult patients use generic Fluocinonide for conditions such as psoriasis, atopic dermatitis, and allergic reactions. Other topical glucocorticoids may not be indicated for the patient's condition.

82.     The generic Fluocinonide products manufactured by Defendants, while formulated differently in certain cases, are each chemical compounds composed of the same raw materials. As such, the generic Fluocinonide products manufactured by Defendants are interchangeable and reasonable substitutes for one another.

### 5.     Opportunities to Conspire.

83.     Defendants' collusive scheme works because each Defendant has constant and continuous opportunities to meet rather than to compete. All Defendants participate in some capacity in GPhA, [36] a leading trade association for generic drug manufacturers and distributors. Defendants Sandoz and Teva, and their subsidiaries, are GPhA members.[37] Taro was a regular meeting attendee during 2014. Defendants' representatives attended many GPhA meetings held between 2014 and 2015:

84.     Additionally, Defendants attend industry trade shows and conferences which provide Defendants' representatives the opportunity to interact with each other directly, and discuss their respective businesses and customers. Recreational and social events at these conferences, such as golf outings, lunches, cocktail parties, dinners, and other activities at these trade shows and conferences provide additional opportunities for conspirators to meet with

---

[36] The GPhA describes itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."

[37] GPhA, Membership, http://www.gphaonline.org/about/membership.

competitors away from the usual business setting. Defendants' representatives use these functions to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

85.    Moreover, the DOJ's grand jury subpoenas and informations also indicate that communications between Defendants were prevalent. The DOJ has stated that "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[38]

86.    The meetings in February and June of 2014 provided Defendants with opportunities to collude. Shortly after the meetings, Defendants acted in concert to raise the price of generic Fluocinonide by a dramatic margin. The price increases resulted from Defendants' horizontal price-fixing agreement.

87.    In this case, Defendants' common membership in GPhA provided them with opportunities to collude by sharing competitive information and collaborating on market strategies with regard to their generic Fluocinonide products.

88.    Further, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to third parties, including Plaintiff and Class Members. Due to Defendants' conduct, Plaintiff and Class Members could not have known that they were paying an artificially inflated price for generic Fluocinonide. Therefore, Defendants are estopped from asserting any applicable statute of limitations in defense of this action.

## VII.    EFFECTS ON COMPETITION AND DAMAGES

89.    Defendants' combination and conspiracy as set forth in this complaint has had the following effects, among others:

---

[38] http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

a. Competition in the market for generic Fluocinonide has been eliminated or substantially reduced;

b. Prices for generic Fluocinonide have increased, and run contrary to the typical pricing patterns of generic drugs;

c. United States purchasers have been deprived of the benefit of free and open competition on the basis of price in the market for generic Fluocinonide; and

d. As a direct and proximate result of Defendants' illicit anticompetitive conduct, Plaintiff and the Class of end-payors have been injured in their business and property in that, during the Class period, they paid artificially inflated prices for generic Fluocinonide.

90.     As a result of Defendants' conduct as herein alleged, Plaintiff and the Class have been damaged as measured by the full amount of the overcharges that they paid in an amount subject to proof and to be determined at trial.

91.     The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## VIII.  <u>ANTITRUST IMPACT</u>

92.     Supracompetitive prices at an upstream level in the chain of distribution ordinarily result in higher prices at every level below.  Such is the case here.

93.     Wholesalers and retailers passed on the supracompetitive prices of generic Fluocinonide to Plaintiff and Class members, who consequently paid overcharges.

94.     Defendants' anticompetitive conduct enabled them to raise, fix, maintain, and stabilize prices to consumers and third-party payors in excess of the prices Defendants otherwise would have been able to charge absent their anticompetitive conduct.

95.    The supracompetitive prices paid by Plaintiff and the Class are traceable to, and the direct, proximate, and foreseeable result of, Defendants' illegal concerted pricing policies.

## IX.    CLASS ACTION ALLEGATIONS

96.    Plaintiffs brings this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> **The Injunctive Class:**
> All persons or entities in the United States and its territories who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for (1) generic Fluocinonide cream 0.05%, (2) generic Fluocinonide cream with emulsified base 0.05%, (3) generic Fluocinonide gel 0.05% and/or (4) generic Fluocinonide ointment 0.05%, other than for resale, for consumption by itself, its families, or its members, employees, insureds, participants, or beneficiaries, from at least as early as June 1, 2014 through and including the date that the anticompetitive effects of Defendants' unlawful conduct ceased.

97.    Plaintiff also brings this action as a class action, under Fed. R. Civ. P. 23(a) and (b)(3), on behalf of themselves and a class of similarly situated individuals seeking damages arising from Defendants' conduct as described below:

> **The Damages Class:**
> All persons or entities who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for (1) generic Fluocinonide cream 0.05%, (2) generic Fluocinonide cream with emulsified base 0.05%, (3) generic Fluocinonide gel 0.05% and/or (4) generic Fluocinonide ointment 0.05% manufactured by Defendants and/or their affiliates in the United States, the District of Colombia, or Puerto Rico for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "Class"), other than for resale at any time during the period August 1, 2014, through the date the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period") in any of the following states, commonwealths, and territories in the United States: Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

98.     The following persons or entities are excluded from the Class:

    a.  Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

    b.  All federal or state governmental entities, excluding cities, towns, or municipalities with self-funded prescription drug plans;

    c.  All persons or entities who purchased generic Fluocinonide for purposes of resale directly from Defendants and their affiliates;

    d.  Fully insured health plans, *i.e.*, plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members;

    e.  Any "flat co-pay" consumers whose purchases were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price;

    f.  Pharmacy Benefits Managers; and

    g.  All judges assigned to this case and any members of their immediate families.

99.     The Class members are so numerous that joinder is impracticable.  Members of the Class are widely dispersed throughout the country.  The Class includes at least hundreds of thousands of consumers and at least thousands of third-party payors.

100.    Plaintiff's claims are typical of the claims of all Class members.  Plaintiff and all Class members were damaged by the same wrongful conduct by Defendants, *i.e.*, they paid artificially inflated prices for generic Fluocinonide, and were deprived of the benefits of competition as a result of Defendants' wrongful conduct.

101.    Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff s interests are coincident with, and not antagonistic to, those of the Class.

102.    Plaintiff is represented by counsel who are experienced and competent in the

prosecution of class action antitrust litigation, and have particular expertise with class action antitrust litigation in the pharmaceutical industry.

103.    Questions of law and fact common to the Class members predominate over any questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class.

104.    Questions of law and fact common to the Class include:

a.    whether Defendants violated sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3;

b.    whether Defendants' combination, conspiracy, or agreement constitutes a violation of the state laws set forth below;

c.    whether Defendants conspired to and did suppress competition in the market for generic Fluocinonide;

d.    whether Defendants' challenged conduct harmed competition in the generic Fluocinonide market;

e.    whether, and to what extent, Defendants' conduct as alleged herein caused antitrust injury to the business or property of Plaintiff and Class members in the form of overcharges; the quantum of aggregate overcharge damages paid by the class;

f.    whether Defendant's concealment of their conduct, as alleged in this Complaint, has equitably tolled any statute of limitations so that Defendant is estopped from asserting a statute of limitations defense by virtue of its inequitable conduct; and

g.    whether Plaintiff and Class members are entitled to injunctive relief to prevent further violation of sections 1 and 3 of the Sherman Act.

105.    Class treatment is a superior method for the fair and efficient adjudication of the

controversy, because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

106.    Class treatment also is appropriate under Rule 23(b)(1) and/or (b)(2) because:

    a.    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants;

    b.    the prosecution of separate actions by individual Class members would create a risk of adjudication of their rights that, as a practical matter, would be dispositive of the interests of other Class members not parties to such adjudications or would substantially impair or impede other Class members' ability to protect their interests; and

    c.    Defendants have acted and refused to act on grounds that apply generally to the Class such that final injunctive relief and/or declaratory relief is warranted with respect to the Class as a whole.

107.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## X.    CLAIMS FOR RELIEF

### CLAIM I
#### Violations of Section 1 of the Sherman Act, 15 U.S.C. S I

**(Asserted against all Defendants)**

108.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

109.    Beginning at least as early as August 1, 2014, the exact date being unknown to Plaintiff and the Class and exclusively within the knowledge of Defendants, Defendants, acting in concert, entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially eliminating or reducing competition in the pricing of generic Fluocinonide in the United States.

110.    Defendants combined and conspired to raise, fix, maintain or stabilize the prices of generic Fluocinonide in the United States during the Class period.

111.    As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their horizontal price-fixing conspiracy, prices for generic Fluocinonide sold to purchasers in the United States during the Class period were raised, fixed, maintained or stabilized at artificially inflated levels.

112.    The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

113.    For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain, and/or stabilize the prices of generic Fluocinonide. Such activities included: (a) participating in meetings to discuss their respective generic Fluocinonide prices and how they could coordinate their market behavior to restrain trade with regard to their generic drug products; (b) agreeing to coordinate and manipulate the prices and available supply of generic Fluocinonide in a manner that deprived United States purchasers of

free and open price competition; and (c) providing pretextual justifications to purchasers and the public to explain the changes in the prices for Defendants' generic Fluocinonide.

114.    Defendants' concerted anticompetitive acts are illegal *per se*.

115.    As a direct and proximate result of Defendants' illegal anticompetitive conduct, Plaintiff and the Class of end-payors have been injured in their business and property in that they have paid more for the generic Fluocinonide that they purchased during the Class period than they otherwise would have paid absent Defendants' wrongful conduct.

116.    By reason of the foregoing, Plaintiff and the Class are entitled to injunctive relief and a reasonable attorney's fee pursuant to Section l6 of the Clayton Act, l5 U.S.C. § 26.

## CLAIM II
### Violations of Section 3 of the Sherman Act, 15 U.S.C. S 3
### (Asserted against all Defendants)

117.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

118.    Beginning at least as early as August 1, 2014, the exact date being unknown to Plaintiff and the Class and exclusively within the knowledge of Defendants, Defendants, acting in concert, entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of section 3 of the Sherman Act, l5 U.S.C. § 3, by artificially eliminating or reducing competition for the pricing of generic Fluocinonide in any territory of the United States or in the District of Columbia.

119.    Defendants combined and conspired to raise, fix, maintain or stabilize the prices of generic Fluocinonide in any territory of the United States or in the District of Columbia during the Class period.

120.    As a result of Defendants' and their co-conspirators' unlawful conduct and acts

taken in furtherance of their horizontal price-fixing conspiracy, prices for generic Fluocinonide sold to purchasers in any territory of the United States or in the District of Columbia during the Class period were raised, fixed, maintained or stabilized at artificially inflated levels.

121.    The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

122.    For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain, and/or stabilize the prices of generic Fluocinonide. Such activities included: (a) participating in meetings to discuss their respective generic Fluocinonide prices and how they could coordinate their market behavior to restrain trade with regard to their generic drug products; (b) agreeing to coordinate and manipulate the prices and available supply of generic Fluocinonide in a manner that deprived United States purchasers of free and open price competition; and (c) providing pretextual justifications to purchasers and the public to explain the changes in the prices for Defendants' generic Fluocinonide.

123.    Defendants' concerted anticompetitive acts are illegal *per se*.

124.    As a direct and proximate result of Defendants' illegal anticompetitive conduct, Plaintiff and the Class of end-payors have been injured in their business and property in that they have paid more for the generic Fluocinonide that they purchased during the Class period than they otherwise would have paid absent Defendants' wrongful conduct.

125.    By reason of the foregoing, Plaintiff and the Class are entitled to injunctive relief and a reasonable attorney's fee pursuant to Section 16 of the Clayton Act, l5 U.S.C. § 26.

**CLAIM III**
**Conspiracy and Combination in Restraint of Trade in Violation of State Laws**
**(Asserted against all Defendants)**

126.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

127.    Beginning at least as early as August 1, 2014, the exact date being unknown to Plaintiff and the Class and exclusively within the knowledge of Defendants, Defendants, acting in concert, entered into a continuing combination, conspiracy or agreement to unreasonably restrain trade and commerce in restraint of trade, the purpose and effect of which was to fix, raise, maintain or stabilize the price of generic Fluocinonide.

128.    Defendants implemented the terms of their combination, conspiracy, or agreement and achieved their intended purpose.    As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff and the Class were harmed as set forth above.

129.    Defendants' unlawful horizontal combination, conspiracy or agreement harmed competition in the market for generic Fluocinonide.

130.    There was and is no legitimate or non-pretextual procompetitive justification for Defendants' coordinated price increases that outweighs their harmful effect.    Even if there were some conceivable justification, the coordinated price increases were not necessary to achieve that purpose.

131.    By engaging in the foregoing conduct, Defendants entered a conspiracy and combination in restraint of trade in violation of the following state laws:  (a) Ala. Code § 6-5-60, *et seq.*, with respect to purchases in Alabama by members of the Damages Class; (b) Arkansas Unfair Practices Statute, Ark, Code, Ann. § 4-75-201, *et seq.* with respect to purchases in Arkansas by members of the Damages Class; (c) Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by members of the Damages Class; (d) Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the

Damages Class; (e) D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by members of the Damages Class; (f) Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Damages Class; (g) Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by members of the Damages Class; (h) Illinois Antitrust Act 740 Illinois Compiled Statutes 10/1, *et seq.* with respect to purchases in Illinois by members of the Damages Class, (i) Iowa Code §§ 553 *et seq.*, with respect to purchases in Iowa by members of the Damages Class; (j) Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by members of the Damages Class; (k) Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by members of the Damages Class; (l) Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Damages Class; (m) Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Damages Class; (n) Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by members of the Damages Class; (o) Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class; (p) Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*, with respect to purchases in Missouri by members of the Damages Class; (q) Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.* with respect to purchases in Montana by members of the Damages Class; (r) Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by members of the Damages Class; (s) Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada by members of the Damages Class; (t) N.H. Rev. Stat. Ann. § 356:1 *et seq.*, with respect to purchases in New Hampshire by Damages Class Members; (u) N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by members of the Damages Class; (v) N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York by members of the

Damages Class; (w) N.C. Gen. Stat. §§ 75-1, *et seq*., with respect to purchases in North Carolina by members of the Damages Class; (x) N.D. Cent. Code §§ 51-08.1-01, *et seq*., with respect to purchases in North Dakota by members of the Damages Class; (y) Or. Rev. Stat. §§ 6.46.705, *et seq*., with respect to purchases in Oregon by members of the Damages Class; (z) R.I. Gen. Laws §§ 6-36-1 *et seq*., with respect to purchases in Rhode Island by members of the Damages Class; (aa) South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*., with respect to purchases in South Carolina by members of the Damages Class; (bb) S.D. Codified Laws Ann. §§ 37-1, *et seq*., with respect to purchases in South Dakota by members of the Damages Class; (cc) Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases in Tennessee by members of the Damages Class; (dd) Utah Code Ann. §§ 76-10-3101, *et seq*., with respect to purchases in Utah by members of the Damages Class; (ee) Vt. Stat. Ann. 9, §§ 2453, *et seq*., with respect to purchases in Vermont by members of the Damages Class; (ff) W.Va. Code §§ 47-18-3, *et seq*., with respect to purchases in West Virginia by members of the Damages Class; and (gg) Wis. Stat. §§ 133.03, *et seq*., with respect to purchases in Wisconsin by members of the Damages Class.

132.    Plaintiff and Class members have been and will continue to be injured in their business or property by reason of Defendants' violations of the laws set forth above, in that Plaintiff and Class members (i) were denied the opportunity to purchase more affordable generic Fluocinonide, and (ii) paid higher prices for generic Fluocinonide than they would have paid but for Defendants' unlawful conduct. Such injuries are of the type that the aforementioned laws were intended to prevent and flow from that which makes Defendants' acts unlawful.

133.    Plaintiff and the Class are entitled to actual and trebled damages as permitted by law.

## CLAIM IV
## Violations of State Consumer Protection Statutes

**(Asserted against all Defendants)**

134.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

135.    Beginning at least as early as August 1, 2014, the exact date being unknown to Plaintiff and the Class and exclusively within the knowledge of Defendants, Defendants, acting in concert, engaged in unfair methods of competition, and unfair and unconscionable acts or practices in the course of trade, with respect to the sale of generic Fluocinonide in violation of the following state consumer protection and unfair competition statutes:  Arkansas Code Annotated, § 4-88-101, *et seq.*; Cal. Bus. & Prof. Code § 17200, *et seq.*; D.C. Code Ann. § 28-3901, *et seq.*; Fla. Stat. § 501.201, *et seq.*; Haw. Rev. Stat. § 480-1, *et seq.*; Kan. Stat. Ann. § 50-623, *et seq.*; Mass. Gen. Laws chapter 93A § l, *et seq.*; Mich. Comp. Laws § 445.901, *et seq.*; Miss. Code § 75-24-1, *et seq.*; Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*; Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, et seq., and §§ 30-14-201, *et seq.*; Neb. Rev. Stat. § 59-1601, *et seq.*; N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*; N.M. Stat. Ann. § 57-12-1, *et seq.*; N.Y. Gen. Bus. Law § 349, *et seq.*; N.C. Gen. Stat. § 75-1.1, et seq.; and Rhode Island Gen. Laws § 6-13.1-1, *et seq.*; South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq.*; 9 Vermont § 2451, *et seq.*

136.    Defendants agreed to, and did, act unfairly in restraint of commerce by affecting, fixing, controlling and/or maintaining, at artificial and supracompetitive levels, the prices at which generic Fluocinonide was sold, distributed, or obtained and made efforts to conceal their agreements from Plaintiff and the Class.

137.    Defendants' intentional anticompetitive acts, described above, were intended to and did cause Plaintiff and/or Class members to pay supracompetitive prices for generic Fluocinonide

in the states listed above.

138.    All of Defendants' unlawful and unfair conduct occurred in the course of their business and was part of a generalized course of conduct.

139.    As a direct and proximate result of the Defendants' unfair methods of competition and unfair and unconscionable trade practices, Plaintiff and the Class have been injured in their business and property in that they paid more for generic Fluocinonide than they otherwise would have paid in the absence of Defendants' unlawful and unfair conduct.

140.    Plaintiff and the Class are therefore entitled to appropriate relief as provided for by the laws of the states set forth above, including but not limited to damages, injunctive relief, reasonable attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits Defendants obtained by reason of their unlawful and unfair conduct.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests that the Court:

A.    Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), (bXl), (bX2), and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure23(c)(2), be given to the Class, and designate the Plaintiff as the representative of the Class;

B.    Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

C.    Award the Class damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

D.     Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and establishment of a constructive trust to remedy Defendants' illegal conduct, including:

1.  A judicial determination declaring the rights of Plaintiff and Class members and the corresponding responsibilities of Defendants;

2.  A declaration that Defendants are to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class members;

3.  Disgorgement and/or the imposition of a constructive trust upon Defendants' ill-gotten gains, thereby freezing Defendants' assets, and/or requiring Defendants to pay restitution to Plaintiff and Class members of all funds acquired by means of any act or practice declared by this Court to violate federal or state statutes or to constitute unfair methods of competition or unfair or unconscionable acts or practices in the course of trade.

E.     Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided for by law.

## XII.   <u>**DEMAND FOR JURY TRIAL**</u>

Pursuant to Federal Rule of Civil Procedure 38 (b), Plaintiff, on behalf of itself and the

Class, demands a trial by jury on all issues so triable.

Edelson & Associates, LLC

Dated:   4-6-17

By: _____

       Marc H. Edelson, Esq.
       Pa. Atty ID No. 51834
       Liberato P. Verderame, Esq.
       Pa. Atty ID No. 80279
       3 Terry Drive, Suite 205
       Newtown, PA 18940
       (215) 867-2399
       (267) 685-0676 (fax)
       medelson@edelson-law.com

       Paul J. Scarlato, Esq.
       Pa. Atty ID No. 47155
       GOLDMAN SCARLATO &
       PENNY, P.C.
       8 Tower Bridge, Suite 1025
       161 Washington Street
       Conshohocken, PA 19428
       Tel: (484) 342-0700
       Fax: (484) 580-8747
       scarlato@lawgsp.com
       *Counsel for Plaintiff Philadelphia*
       *Federation of Teachers Health and*
       *Welfare Fund and the Proposed Class*